973 A.2d 390 (2009)
408 N.J. Super. 54
Marina STENGART, Plaintiff-Appellant,
v.
LOVING CARE AGENCY, INC., Steve Vella, Robert Creamer, Lorena Lockey, Robert Fusco, and LCA Holdings Inc., Defendants-Respondents.
No. A-3506-08T1
Superior Court of New Jersey, Appellate Division.
Argued May 13, 2009.
Decided June 26, 2009.
*393 Donald P. Jacobs, Short Hills, argued the cause for appellant (Budd Larner, P.C., attorneys; Mr. Jacobs and Allen L. Harris, on the brief).
Lynne Anne Anderson, Newark, argued the cause for respondents (Sills Cummis & Gross, P.C., attorneys; Ms. Anderson, of counsel; Jerrold J. Wohlgemuth, on the brief).
Before Judges FISHER, C.L. MINIMAN and BAXTER.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we address whether workplace regulations converted an employee's emails with her attorney-sent through the employee's personal, password-protected, web-based email account, but via her employer's computer  into the employer's property. Finding that the policies undergirding the attorney-client privilege substantially outweigh the employer's interest in enforcement of its unilaterally imposed regulation, we reject the employer's claimed right to rummage through and retain the employee's emails to her attorney.

I
Plaintiff Marina Stengart was Executive Director of Nursing at Loving Care, Inc. (the company) until her resignation on or about January 2, 2008. The following month, she filed this action against the company alleging, among other things, violations of the Law Against Discrimination, N.J.S.A. 10:5-1 to -49.
As part of the employment relationship, the company provided plaintiff with a laptop computer and a work email address. Prior to her resignation, plaintiff communicated with her attorneys, Budd Larner, P.C., by email. These communications pertained to plaintiff's anticipated suit against the company, and were sent from plaintiff's work-issued laptop but through her personal, web-based, password-protected Yahoo email account.
After plaintiff filed suit, the company extracted and created a forensic image of the hard drive from plaintiff's computer. In reviewing plaintiff's Internet browsing history, an attorney at Sills Cummis discovered and, as he later certified, "read numerous communications between [plaintiff] and her attorney from the time period prior to her resignation from employment with [the company]." Sills Cummis did not advise Budd Larner that the image extracted from the hard drive included these communications.
Many months later, in answering plaintiff's interrogatories, the company referenced and included some of plaintiff's emails with her attorneys. Budd Larner requested the immediate identification of all other similar communications, the return of the originals and all copies, and the identification of the individuals responsible for collecting them. When Sills Cummis refused, plaintiff applied for an order to show cause with temporary restraints. The judge denied temporary restraints but scheduled the application as a motion.
On the return date, the trial judge denied plaintiff's motion in all respects, finding that the emails were not protected by the attorney-client privilege because the company's electronic communications policy put plaintiff on sufficient notice that her emails would be viewed as company property. We granted leave to appeal.

II
In support of its claimed right to pry into and retain plaintiff's communications *394 with her attorney, the company relies upon the following electronic communications policy allegedly contained in the company handbook[1]:
[1] The company reserves and will exercise the right to review, audit, intercept, access, and disclose all matters on the company's media systems and services[[2]] at any time, with or without notice.
. . . .
[2] E-mail and voice mail messages, internet use and communication and computer files are considered part of the company's business and client records. Such communications are not to be considered private or personal to any individual employee.
[3] The principal purpose of electronic mail (e-mail) is for company business communications. Occasional personal use is permitted. ...
. . . .
[4] Certain uses of the e-mail system are specifically prohibited, including but not limited to:
[a] Messages that include comments or pictures of a sexual, discriminatory, harassing, inappropriate or offensive nature;
[b] Forwarding of chain letters;
[c] Messages in violation of government laws (e.g. sending copies in violation of copyright laws);
[d] Job searches or other employment activities outside the scope of company business (e.g., "moonlighting["]);
[e] Business activities not related to Loving Care Agency;
[f] Political activities.
Before examining the conflict between an employer's workplace regulations and the attorney-client privilege, we consider plaintiff's threshold arguments regarding the factual disputes surrounding the alleged dissemination and application of the company's policy regarding emails and other similar communications, as well as whether the policy's terms are sufficiently clear to warrant enforcement of the company's interpretation of the policy.

A
In seeking the return of her emails with her attorney, plaintiff argued that the company failed to demonstrate it had ever adopted or distributed such a policy, that she was unaware of an electronic communications policy that applied to executives such as herself, and that if such a policy existed and applied, the company had not previously enforced it. In response, the company asserted that it had disseminated a handbook containing the policy quoted above, that the policy was finalized approximately one year before plaintiff sent the emails in question, and that the policy's provisions applied to all employees, including executives, without exception.
In considering these factual disputes, we are immediately struck by the fact that the record on appeal contains multiple versions of an electronic communications policy,[3] and that there is a lack of certainty exhibited by the record as to which, if any, version of the policy may have actually *395 applied to employees in plaintiff's position.[4] This uncertainty regarding the foundation for the company's position dovetails and supports plaintiff's argument that drafts of at least five separate handbooks were under discussion and that no definite, applicable policy was in place by the time she resigned from the company. Moreover, these doubts are not dispelled by the trial judge's conclusion that, as an administrator "who had sufficiently high level awareness of the company policy with distribution responsibilities for it," plaintiff had constructive knowledge of the applicable policy; if the judge believed plaintiff was in a position to know the company policy, we wonder why she did not then assume the truth of plaintiff's certification that the policy was still a work in progress at the time she left the company. In any event, it suffices to say that the parties disputed whether the policy cited by the company in support of its position had ever been finalized, formally adopted, or disseminated to employees.
In addition, as we have noted, plaintiff provided a certification in support of her motion that the policy quoted above did not apply to executives; a former executive of the company corroborated plaintiff's position in his certification. On the other hand, the company provided the certification of its current chief executive officer rebutting plaintiff's contentions, thus creating a genuine factual dispute on this particular point. The judge, rather than conduct a hearing to resolve this and the other material disputes we have mentioned, concluded that the policy applied to executives because "[n]othing in the [h]andbook exempts Directors or those similarly situated." In short, the judge identified the particular version of the policy she believed applied and rejected plaintiff's sworn factual contentions that the company had not yet finalized an applicable policy by the time she was terminated by reference to the language of the disputed policy itself.
These factual disputes surrounding the identification of the policy that applied to plaintiff  if any so applied  presented to the judge a substantial obstacle to a determination of the disputes about the emails exchanged by plaintiff and her attorney. These threshold questions could not be resolved by resort only to the parties' competing certifications.

B
Assuming the policy we quoted earlier was in effect and applied to plaintiff at the time she sent the emails in question, further questions abound about the meaning and scope of the policy and, specifically, whether the policy covers emails sent to an attorney by way of an employee's personal, password-protected internet email account, when a company-issued computer is the vehicle used to send and receive those emails.
The trial judge found that the company's policy put employees on sufficient notice that electronic communications, "whether made from her company E-mail address or an internet based E-mail address would be subject to review as company property." In reaching this conclusion, the judge stated that the company policy "specifically place[d] plaintiff on notice that all of her internet based communications [we]re not to be considered private or personal" and that the policy "put employees on notice that the technology resources made available to employees were to be used for *396 work related purposes, particularly during business hours." According to the judge, the policy adequately warned there was no reasonable expectation of privacy "with respect to any communication made on company issued laptop computers and server, regardless of whether the E-mail was sent from plaintiff's work E-mail account or personal web-based E-mail account."
We are not so confident that this is the result an objective reader would derive from the policy's various terms. For example, while paragraph 1 may provide support for the company's broad interpretation  by indicating that the company "reserves and will exercise the right to ... intercept ... matters on the company's media systems and services"  the policy neither defines nor suggests what is meant by "the company's media systems and services," nor do those words alone convey a clear and unambiguous understanding about their scope. But, even if we were to conclude those words would denote to an objective reader the broad scope urged by the company, there remains a conflict between the declarations in paragraph 2  that "E-mail and voice mail messages, internet use and communication and computer files" are considered "part of the company's business and client records" and not "private or personal to any individual employee"  with the recognition in paragraph 3 that "[o]ccasional personal use is permitted." An objective reader could reasonably conclude from a comparison of paragraphs 2 and 3 that not all personal emails are necessarily company property because the policy expressly recognizes that occasional personal use is permitted.[5] Moreover, the policy makes no attempt to suggest when personal use is permitted; here, rather than explain when personal uses are and are not permitted, the company simply seeks to arrogate unto itself the power to keep all personal emails. In addition, the record reveals that the company had its own "e-mail system" for communications within and without the company. The references to the use or misuse of this "e-mail system" in paragraph 4 could reasonably be interpreted to refer only to the company's work-based system and not to an employee's personal private email account accessed via the company's computer.
These ambiguities cast doubt over the legitimacy of the company's attempt to seize and retain personal emails sent through the company's computer via the employee's personal email account. Paragraph 4 and its subparagraphs suggest the legitimate company interest in precluding employees from engaging in communications that may be illegal, offensive, damaging to the company or in breach of the duties an employee owes to the employer. For example, paragraph 4 bars an employee from using the company's "e-mail system" to send emails in violation of "government laws," for political activities, in searching for a new job, or to engage in offensive or harassing conduct, among other things. But it does not necessarily or logically follow from these examples that an employee would objectively understand that in vindicating those legitimate business interests, the company intended to retain private emails as its property rather than the employee's. Moreover, the listing of specific prohibitions set forth in paragraph 4 could very well convey to an objective reader that personal emails, which do not fit those descriptions, are of the type that are "[o]ccasional[ly] ... permitted."
*397 In short, although the matter is not free from doubt, there is much about the language of the policy that would convey to an objective reader that personal emails, such as those in question, do not become company property when sent on a company computer, and little to suggest that an employee would not retain an expectation of privacy in such emails.

C
The trial judge resolved these disputed threshold contentions and interpreted the policy against plaintiff without conducting an evidentiary hearing to either illuminate the policy's meaning or resolve the parties' factual disputes about the policy's adoption, dissemination and application. In defending the process adopted by the judge, the company relies upon the discretion possessed by judges in ruling on discovery matters. That argument is misguided. Judges do have broad discretion in deciding discovery disputes, see Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492, 734 A.2d 1147 (1999), but that does not empower judges to adjudicate on the papers factual disputes critical to the exercise of that discretion, see Klier v. Sordoni Skanska Constr. Co., 337 N.J.Super. 76, 85-86, 766 A.2d 761 (App.Div.2001); Conforti v. Guliadis, 245 N.J.Super. 561, 565, 586 A.2d 318 (App.Div.1991), aff'd in part and modified in part, 128 N.J. 318, 322-23, 608 A.2d 225 (1992). Ordinarily, the adoption of such a flawed procedure would be cause alone to reverse. However, we need not decide the appeal solely on that point. Even if we accept the version of the facts and the interpretation of the policy urged by the company, and proceed to an analysis of the enforceability of the policy in these particular circumstances, we find the order under review to be erroneous.
As a result, we examine the enforceability of a company policy, which purports to transform private emails or other electronic communications between an employee and the employee's attorney into company property. This requires a balancing of the company's right to create and obtain enforcement of reasonable rules for conduct in the workplace against the public policies underlying the attorney-client privilege. We turn first to the extent to which courts will enforce rules and regulations imposed by an employer on its employees.

III
The willingness of courts to enforce an employer's unilateral rules and regulations is of relatively recent vintage. Until only a few decades ago, courts did not generally enforce provisions contained in employee manuals. Rachel Leiser Levy, Judicial Interpretation of Employee Handbooks: The Creation of a Common Law Information-Eliciting Penalty Default Rule, 72 U. Chi. L.Rev. 695, 701 (2005); see, e.g., Johnson v. Nat'l Beef Packing Co., 220 Kan. 52, 551 P.2d 779, 782 (1976) (noting that an employee handbook was "only a unilateral expression of company policy and procedures" and "no meeting of the minds was evidenced by the defendant's unilateral act of publishing company policy"); Sargent v. Ill. Inst. of Tech., 78 Ill.App.3d 117, 33 Ill.Dec. 937, 397 N.E.2d 443, 446 (1979) (holding that a personnel manual was not an enforceable contract because, by agreeing to be bound by the guidelines in the handbook, an employee "has merely agreed to properly perform his required duties"). Beginning in the early 1980's, when governmental deregulation of business and industry became de rigueur, "virtually every state supreme court reconsidered its treatment of employee handbooks and concluded that under the right conditions a handbook could be transformed into a unilateral contract." Levy, supra, 72 U. Chi. L.Rev. at 701; see Pine River *398 State Bank v. Mettille, 333 N.W.2d 622, 629-30 (Minn.1983) (concluding that handbook provisions are enforceable without the need for consideration beyond the employee's continued performance of services); Toussaint v. Blue Cross & Blue Shield, 408 Mich. 579, 292 N.W.2d 880, 892 (1980) (finding that policy statements can give rise to contractual rights without evidence that the parties mutually agreed that the policy statements created such rights).
In Woolley v. Hoffmann-La Roche, 99 N.J. 284, 491 A.2d 1257, modified on other grounds, 101 N.J. 10, 499 A.2d 515 (1985), our Supreme Court recognized that an employee handbook could create a binding employment contract. The Court instructed that when an employer circulates such a manual, "the judiciary, instead of `grudgingly' conceding the enforceability of those provisions, should construe them in accordance with the reasonable expectations of the employees." Id. at 297-98, 491 A.2d 1257. The Court determined that an employee manual "is an offer that seeks the formation of a unilateral contract," and that an employee's continued employment is the "bargained-for action needed to make the offer binding." Id. at 302, 491 A.2d 1257. See also Anthony v. Jersey Cent. Power & Light Co., 51 N.J.Super. 139, 143, 143 A.2d 762 (App.Div.1958).
As a result, our courts have since recognized that employers may unilaterally disseminate company rules and policies through handbooks or manuals and impose their contents on employees. Woolley, supra, 99 N.J. at 309, 491 A.2d 1257. It is thus understood that widely distributed handbooks can "ensure some amount of consistency in the administration of personnel matters," and "serve[] top management's interests in maintaining a degree of centralized control across a large organization." Rachel S. Arnow-Richman, Employment as Transaction, 39 Seton Hall L.Rev. 447, 489 (2009). Consequently, employers now regularly utilize handbooks because they "ensure that both employees and managers inhabit a `level playing field' regarding knowledge of company policies and procedures." Levy, supra, 72 U. Chi. L.Rev. at 721. By establishing and enforcing policies and practices, an employer gains an orderly and cooperative work force, Toussaint, supra, 292 N.W.2d at 891, and the employee obtains a clear understanding of the employer's expectations.
However, this view of the salutary nature of employee handbooks has never been limitless. Contrary to the thrust of the company's argument here, an employer's rules and policies must be reasonable to be enforced. See Jackson v. Bd. of Review, 105 Ill.2d 501, 86 Ill.Dec. 500, 475 N.E.2d 879, 885 (1985). There must be a nexus between the rule and what an employer may reasonably require of its employees. Stated another way, to gain enforcement in our courts, the regulated conduct should concern the terms of employment and "reasonably further the legitimate business interests of the employer." Western Dairymen Coop. v. Bd. of Review, 684 P.2d 647, 649 (Utah 1984); see also 27 Am.Jur.2d Employment Relations § 167 (2004) (stating that "[a]n employer has the right to establish reasonable rules for employees, and employees are required to obey the reasonable rules, orders and instructions of [their] employers").
We have no doubt that many aspects of the policy in question are reasonable and represent "helpful" directions in employment relationships. Woolley, supra, 99 N.J. at 309, 491 A.2d 1257. Certainly, the subparts of paragraph 4 provide clear rules for the use of company computers that the company may legitimately enforce *399 as a means of protecting itself, other employees, and the company's reputation; those specific declarations impose a definite understanding that company computers are to be used in aid of the company's business. See Toussaint, supra, 292 N.W.2d at 891.
In addition, paragraphs 1 and 2 reflect the entirely proper imposition of the company's right to own and possess communications made by the employee in the furtherance of the company's business. As interpreted by the company, however, those provisions purport to reach into the employee's personal life without a sufficient nexus to the employer's legitimate interests. This claimed right seems to be based principally on the fact that the computer used to make personal communications is owned by the company, although the company provides no plausible explanation for the policy's expressed acknowledgment that "[o]ccasional personal use is permitted." No rationale is offered to explain how one aspect of the policy creates the company's absolute right to retain, as its own property, all emails whether business-related or personal, with the provision that "[o]ccasional personal use is permitted."
Ignoring the significance of its express permission for "[o]ccasional personal use," the company's argument appears to rely chiefly on the fact that plaintiff utilized the company's computer and that anything flowing from that use becomes subject to the company's claimed ownership right. We reject the company's ownership of the computer as the sole determinative fact in determining whether an employee's personal emails may become the company's property.
In this regard, we agree with the tenor of a recent decision of the New York Court of Appeals, which discounted the significance of the fact that a company computer was the means by which an employee sent and received personal communications through a separate email account. See Thyroff v. Nationwide Mut. Ins. Co., 8 N.Y.3d 283, 832 N.Y.S.2d 873, 864 N.E.2d 1272 (2007). Thyroff recognized that a computer in this setting constitutes little more than a file cabinet for personal communications. Id. at 1278. Property rights are no less offended when an employer examines documents stored on a computer as when an employer rifles through a folder containing an employee's private papers or reaches in and examines the contents of an employee's pockets; indeed, even when a legitimate business purpose could support such a search, we can envision no valid precept of property law that would convert the employer's interest in determining what is in those locations with a right to own the contents of the employee's folder of private papers or the contents of his pocket. As a result, we conclude a breach of a company policy with regard to the use of its computers does not justify the company's claim of ownership to personal communications and information accessible therefrom or contained therein.
Although there may be gray areas where an employer possesses a legitimate interest in accessing personal communications from a company computer that impact on its business or reputation, see, e.g., State v. M.A., 402 N.J.Super. 353, 954 A.2d 503 (App.Div.2008); Doe v. XYC Corp., 382 N.J.Super. 122, 126, 887 A.2d 1156 (App. Div.2005), the matter at hand does not present the same or similar circumstances considered in M.A.,[6] upon which the company *400 places great emphasis, or Doe,[7] nor does it present a doubtful question in resolving the conflict between an employee's private interests and the employer's business interests. Although plaintiff's emails to her attorney related to her anticipated lawsuit with the company, the company had no greater interest in those communications than it would if it had engaged in the highly impermissible conduct of electronically eavesdropping on a conversation between plaintiff and her attorney while she was on a lunch break.
Certainly, the electronic age  and the speed and ease with which many communications may now be made  has created numerous difficulties in segregating personal business from company business. Today, many highly personal and confidential transactions are commonly conducted via the Internet, and may be performed in a moment's time. With the touch of a keyboard or click of a mouse, individuals may access their medical records,[8] examine activities in their bank accounts and phone records,[9] file income tax returns,[10] and engage in a host of other private activities, including, as here, emailing an attorney regarding confidential matters. Regardless of where or how those communications occur, individuals possess a reasonable expectation that those communications will remain private.[11]See Quon v. Arch Wireless Operating Co., Inc., 529 F.3d 892, 905 (9th Cir.2008) (finding a reasonable expectation of privacy in text messages stored by a service provider), reh. denied, 554 F.3d 769 (9th Cir.2009), petition for cert. filed, No. 08-1332, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___ (U.S. Apr. 27, 2009).
*401 A policy imposed by an employer, purporting to transform all private communications into company property  merely because the company owned the computer used to make private communications or used to access such private information during work hours  furthers no legitimate business interest. See Western Dairymen Coop., supra, 684 P.2d at 649. When an employee, at work, engages in personal communications via a company computer, the company's interest-absent circumstances the same or similar to those that occurred in M.A. or Doe-is not in the content of those communications; the company's legitimate interest is in the fact that the employee is engaging in business other than the company's business. Certainly, an employer may monitor whether an employee is distracted from the employer's business and may take disciplinary action if an employee engages in personal matters during work hours; that right to discipline or terminate, however, does not extend to the confiscation of the employee's personal communications.[12]
Here, we make no attempt to define the extent to which an employer may reach into an employee's private life or confidential records through an employment rule or regulation. Ultimately, these matters may be a subject best left for the Legislature. But, it suffices for present purposes to say that the past willingness of our courts to enforce regulations unilaterally imposed upon employees is not limitless; the moral force of a company regulation loses impetus when based on no good reason other than the employer's desire to rummage among information having no bearing upon its legitimate business interests.
We thus reject the philosophy buttressing the trial judge's ruling that, because the employer buys the employee's energies and talents during a certain portion of each workday, anything that the employee does during those hours becomes company property. Although we recognize the considerable scope of an employer's right to govern conduct and communications in the workplace, the employer's interest in enforcing its unilateral regulations wanes when the employer attempts to reach into purely private matters that have no bearing on the employer's legitimate interests.
Moreover, in this case, the company's ebbing interest in enforcing its regulations, as the means of prying into an employee's private affairs, must be weighed against the employee's considerable interest in maintaining the confidentiality of her communications with her attorney  a subject to which we now turn.

IV
Communications between a lawyer and client in the course of their relationship and in professional confidence are privileged. N.J.S.A. 2A:84A-20. The scope of this privilege is defined by N.J.R.E. 504, which grants clients the following rights:
(a) to refuse to disclose any such communication, and (b) to prevent his lawyer from disclosing it, and (c) to prevent any other witness from disclosing such communication if it came to the knowledge of such witness (i) in the course of its transmittal between the client and the lawyer, or (ii) in a manner not reasonably to be anticipated, or (iii) as a result of a breach of the lawyer-client *402 relationship, or (iv) in the course of a recognized confidential or privileged communication between the client and such witness.
The attorney-client privilege is venerable, Fellerman v. Bradley, 99 N.J. 493, 498, 493 A.2d 1239 (1985), having been recognized in the English common law prior to our Nation's birth, United Jersey Bank v. Wolosoff, 196 N.J.Super. 553, 561, 483 A.2d 821 (App.Div.1984); see Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591 (1981). The privilege is "basic to a relation of trust and confidence" that is among "the oldest of the privileges for confidential communications, going back to the reign of Elizabeth." State v. Kociolek, 23 N.J. 400, 415, 129 A.2d 417 (1957).
Over the years, "the primary justification and dominant rationale for the privilege has come to be the encouragement of free and full disclosure of information from the client to the attorney." Fellerman, supra, 99 N.J. at 498, 493 A.2d 1239. As a result, when the privilege applies it "must be given as broad a scope as its rationale requires." Ervesun v. Bank of New York, 99 N.J.Super. 162, 168, 239 A.2d 10 (App.Div.), certif. denied, 51 N.J. 394, 241 A.2d 11 (1968). Both oral and written communications between attorney and client are protected by the privilege. Weingarten v. Weingarten, 234 N.J.Super. 318, 329, 560 A.2d 1243 (App.Div.1989). Email communications are "obviously protected by the attorney-client privilege as a communication with counsel in the course of a professional relationship and in confidence." Seacoast Builders Corp. v. Rutgers, 358 N.J.Super. 524, 553, 818 A.2d 455 (App.Div.2003).
There is no question  absent the impact of the company's policy  that the attorney-client privilege applies to the emails and would protect them from the view of others. In weighing the attorney-client privilege, which attaches to the emails exchanged by plaintiff and her attorney, against the company's claimed interest in ownership of or access to those communications based on its electronic communications policy, we conclude that the latter must give way. Even when we assume an employer may trespass to some degree into an employee's privacy when buttressed by a legitimate business interest, we find little force in such a company policy when offered as the basis for an intrusion into communications otherwise shielded by the attorney-client privilege.
Giving the company the benefit of all doubts about the threshold disputes mentioned in earlier sections of this opinion, as well as the broadest interpretation of its electronic communications policy permitted, despite the obvious ambiguities in the policy's text, we nevertheless are compelled to conclude that the company policy is of insufficient weight when compared to the important societal considerations that undergird the attorney-client privilege. As a result, we conclude that the judge exhibited inadequate respect for the attorney-client privilege when she found that plaintiff "took a risk of disclosure of her communications and a risk of waiving the privacy she expected" when she communicated with her attorney through her work-issued computer, and that plaintiff's action in the face of the policy "constitute[d] a waiver of the attorney client privilege." Accordingly, we reverse the order under review and conclude that the emails exchanged by plaintiff and her attorney through her personal Yahoo email account remain protected by the attorney-client privilege. There being no other basis for finding a waiver of the privilege, the judge erred in denying plaintiff's motion for the return of all copies of the emails in question.

*403 V
As we have already mentioned, the company's attorney has examined the privileged emails in question, referencing them in the little discovery that has taken place to date in this matter. We conclude that counsel's actions were inconsistent with the obligations imposed by RPC 4.4(b), which provides that when representing a client, "[a] lawyer who receives a document and has reasonable cause to believe that the document was inadvertently sent shall not read the document or, if he or she has begun to do so, shall stop reading the document, promptly notify the sender, and return the document to the sender."
In considering these obligations, we are not unmindful that circumstances may arise when the attorney who has received such a document  whether through paper discovery or by forensically examining a computer's hard drive  may arguably believe the document is not protected by the attorney-client privilege. For example, the attorney here assumed that the company's policy regarding the use of its computers turned plaintiff's privileged emails into the company's property. Notwithstanding such an assumption, attorneys are obligated, as suggested by RPC 4.4(b), to cease reading or examining the document, protect it from further revelations, and notify the adverse party of its possession so that the attorney's right to retain or make use of the document may thereafter be adjudicated by the court.
Here, rather than follow such an approach, Sills Cummis appointed itself the sole judge of the issue and made use of the attorney-client emails without giving plaintiff an opportunity to advocate a contrary position. That being the case, we reject the trial judge's finding that Sills Cummis had no affirmative duty "to alert plaintiff that it was in possession of the subject E-mail before reading it because Sills Cummis believed in good faith, based on [the company's] policy, that the E-mail was not protected by any privilege." Sills Cummis may have reached that determination in good faith; but counsel thereafter acted in studied indifference to the right of plaintiff to argue otherwise and to seek a contrary ruling from an impartial judge.
Plaintiff argues that, as a consequence of Sills Cummis's failure to place the matter in litigation prior to reading and utilizing the disputed emails, the firm should be disqualified from further participation in this case. Courts possess the inherent authority to impose sanctions for violations of the spirit of the discovery rules. Summit Trust Co. v. Baxt, 333 N.J.Super. 439, 450, 755 A.2d 1214 (App. Div.), certif. denied, 165 N.J. 678, 762 A.2d 658 (2000). Disqualification of counsel is a discretionary remedy that may be imposed, although it is a remedy that should be used sparingly. Cavallaro v. Jamco Prop. Mgmt., 334 N.J.Super. 557, 572, 760 A.2d 353 (App.Div.2000); see Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 221, 536 A.2d 243 (1988).
Although we need not attempt to define all the circumstances that may be relevant to this determination, the remedy of disqualification in this instance should at least involve a consideration of the content of the emails, whether the information contained in the emails would have inevitably been divulged in discovery that would have occurred absent Sills Cummis's knowledge of the emails' content, and the nature of the issues that have been or may in the future be pled in either this or the related Chancery action.[13] These are matters *404 better assessed, in the first instance, in the trial court. Accordingly, we remand for a hearing to determine whether Sills Cummis should be disqualified or, if not, whether any other appropriate sanction should be imposed as a result of the circumstances to which we have alluded. We deem it advisable that the hearing be conducted by the Chancery judge, who not only has the benefit of being familiar with the issues in the related case now before her, but also because the Chancery judge is not in the same position as the Law Division judge, who may yet retain a commitment to the determination she previously made on the issues we have now decided differently. See R. 1:12-1; New Jersey Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 618, 512 A.2d 438 (1986).
In conclusion, we reverse the order under review and remand for the entry of an order requiring the turnover of all emails exchanged by plaintiff and her attorney that are now in possession of either the company, the company's attorneys, or their agents or employees. The order should also direct the deletion of all these emails from any computer hard drives upon which they were stored. We also remand for a hearing to determine whether Sills Cummis should be disqualified from further representing the company; that hearing is to be conducted by the Chancery judge in the related case. Discovery is stayed in this action pending a resolution of the disqualification issue.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] We have numbered these relevant paragraphs for the reader's convenience.
[2] It is not clear whether the use of the word "services" is a typographical error; the context could suggest that the company meant "server."
[3] The record contains a number of alternative versions or drafts of an electronic communications policy without any clear explanation as to why we should assume the policy quoted above is that which actually applied.
[4] We note the company has not produced a signed acknowledgement from plaintiff that she received and understood the company's policy, as is the custom among employers in these matters.
[5] Certainly, it would be an unreasonable interpretation to assume that even though the policy permits "occasional personal use," personal emails would nevertheless become company property.
[6] In M.A., when hired as a bookkeeper, the defendant was advised that the "computers or anything in the office is company property." Id. at 359, 954 A.2d 503. Later, after gaining the employer's trust, the defendant installed a secret password and stored personal information in the employer's computer system. The defendant thereafter made a purchase using the employer's credit card and called the employer's payroll company to increase his salary. The defendant was discharged when the employer discovered these thefts. In the context of the criminal proceedings and a police search of the contents of the computer system that followed, the defendant argued he had a reasonable expectation of privacy in the computers. In that context, we held that this expectation was unreasonable, id. at 369, 954 A.2d 503, noting that the defendant's "personal information was not the focus of the search; it did not confirm his theft; and the record is silent as to whether it played a role in the indictment." Id. at 366, 954 A.2d 503.
[7] In Doe, we held that an employee did not have a reasonable expectation of privacy when the employer exercised the policy-based right to examine the company computer to determine whether the employee had accessed child pornography. Paragraph 4(a) in the policy in question specifically prohibits the conduct dealt with in Doe and, in light of that subpart's specificity, negates any expectation the employee may have had in engaging in those types of communications. Those legitimate company interests were not implicated here.
[8] See N.J.S.A. 26:2H-12.8g; Kinsella v. NYT Television, 382 N.J.Super. 102, 107, 887 A.2d 1144 (App.Div.2005).
[9] See State v. McAllister, 184 N.J. 17, 29-33, 875 A.2d 866 (2005) (holding that individuals have a reasonable expectation of privacy in their financial records in the possession of banks); State v. Hunt, 91 N.J. 338, 348, 450 A.2d 952 (1982) (holding that individuals have a reasonable expectation of privacy in long distance telephone records in the possession of the telephone company).
[10] See Ullmann v. Hartford Fire Ins. Co., 87 N.J.Super. 409, 415-16, 209 A.2d 651 (App. Div.1965) (holding that public policy favors the nondisclosure of an individual's income tax returns); see also Campione v. Soden, 150 N.J. 163, 190, 695 A.2d 1364 (1997).
[11] In addition, in keeping pace with the rapid advances of technology, our Supreme Court has found an expectation of privacy in the information stored in a personal pager, State v. DeLuca, 168 N.J. 626, 631-32, 775 A.2d 1284 (2001), and in the subscriber information an individual provides to an Internet service provider, State v. Reid, 194 N.J. 386, 399, 945 A.2d 26 (2008).
[12] Indeed, this conclusion more closely comports with the policy's multiple declarations about its purpose, i.e., "[the company] retains the authority to take corrective action for conduct which the company considers unacceptable..."; "[a]buse of the electronic communications system may result in disciplinary action up to and including separation of employment."
[13] Not long after the commencement of this action, the company brought an action in the Chancery Division in the same vicinage against plaintiff, as well as others, alleging they have engaged in a competing business in contravention of a restrictive covenant. Loving Care Agency, Inc. v. Starlight Home Care Agency, Inc., et ah, BER-C-508-08. After we heard argument in this appeal, defendants in that action, which include plaintiff here, sought leave to appeal orders subsequently entered by the Chancery judge in the related action that permitted discovery to occur in that action, excepting only discovery "related to the disputed e-mails." By way of an unpublished order entered on June 5, 2009, we granted leave to appeal and reversed the orders that permitted any discovery to occur in the Chancery action pending our disposition of this appeal. No. AM-661-08.