*935 OPINION OF THE COURT
Charles Edward Ramos, J.
In motion sequence 10,[1] plaintiff Dr. Scott moves pursuant to CPLR 3103 for a protective order requiring defendants Beth Israel Medical Center and Continuum Health Partners Inc. (collectively BI) to return to plaintiff all e-mail correspondence between plaintiff and his attorney.[2] In motion sequence 11,[3] BI moves pursuant to CPLR 3103 for a protective order barring plaintiff from obtaining discovery from BI concerning a governmental or regulatory investigation of BI.
The court presumes familiarity with the background of the case which is set forth in its prior decision dated May 12, 2006 in which the court granted summary judgment to BI and dismissed the case rendering all other pending motions moot. By decision dated June 19, 2007, the Appellate Division, First Department, reversed and restored all six causes of action (41 AD3d 222 [2007]).
Under the contract at issue here, BI agreed to pay Dr. Scott $14,000,000 in severance pay if he was terminated without cause. BI asserts that Dr. Scott was terminated for cause while Dr. Scott, believing that he was terminated without cause and without receiving any of the specified severance pay, commenced this action for breach of contract against BI.
Dr. Scott’s Motion for a Protective Order
On August 10, 2005, BI’s counsel, Marvin Wexler of Kornstein Veisz Wexler & Pollard, LLP, sent a letter to plaintiffs counsel, Stuart Kagen of Paul Weiss Rifkind Wharton & Garrison LLP (PW), asserting that BI was in possession of e-mail correspondence between Dr. Scott and PW pertaining to Dr. Scott’s dispute with BI, as well as e-mails written between Dr. Scott and Cohen Lans LLP regarding a separate dispute. The letter further stated that although no one at BI had read the e-mails yet, BI believed that any potential privilege attached to the communications had been waived by use of BI’s e-mail system.
Mr. Kagen responded on August 15, 2005 informing Mr. Wexler that the documents are privileged communications belong *936 ing to Dr. Scott for which there had been no waiver of privilege and requesting the immediate return of the e-mails to Dr. Scott.
When BI refused to return the documents, the parties called Andrea Masley, the judge’s court attorney, who instructed BI to provide copies of the e-mails to Dr. Scott, place copies of the documents into a sealed envelope and bar anyone from reviewing the e-mails pending a resolution by the court. Thereafter, Dr. Scott filed this motion for a protective order seeking the return of the documents.[4]
Dr. Scott argues that the e-mails are privileged under both the attorney-client privilege and work product doctrine. BI counters that the e-mails were never protected by the attorney-client privilege because Dr. Scott could not have made the communication in confidence when using BI’s e-mail system in violation of BI’s e-mail policy. BI also argues that both privileges were waived by Dr. Scott’s use of BI’s e-mail system.
The e-mails in question were all written between February 2004 and August 3, 2004 using Dr. Scott’s employee e-mail address and were all sent over BI’s e-mail server.
BI’s e-mail policy states:
“This Policy clarifies and codifies the rules for the use and protection of the Medical Center’s computer and communications systems. This policy applies to everyone who works at or for the Medical Center including employees, consultants, independent contractors and all other persons who use or have access to these systems.
“1. All Medical Center computer systems, telephone systems, voice mail systems, facsimile equipment, electronic mail systems, Internet access systems, related technology systems, and the wired or wireless networks that connect them are the property of the Medical Center and should be used for business purposes only.
“2. All information and documents created, received, saved or sent on the Medical Center’s computer or communications systems are the property of the Medical Center.
“Employees have no personal privacy right in any material created, received, saved or sent using Medi *937 cal Center communication or computer systems. The Medical Center reserves the right to access and disclose such material at any time without prior notice.”
This policy is contained in the BI Human Resources Policy and Procedure Manual. According to Bart Metzger, vice-president of human resources for BI, it was available in hard copy and maintained in the office of the administrator for each department and on BI’s intranet. (Metzger affidavit, Sept. 23, 2005, If 4.) Dr. Scott was the chairman of the orthopedics department and worked closely with the administrator of that department. In 2002, BI distributed to every employee an employee handbook that contained a brief summary of the BI e-mail policy. (Metzger affidavit 11 8.) From 2002 on, newly hired doctors were required to sign a form acknowledging that they had read and were familiar with BI’s e-mail policy. (Kathleen Lenhardt affidavit, Oct. 8, 2005.) Dr. Scott never signed such an acknowledgment and denies knowledge of the policy.
Every e-mail that PW sent to Dr. Scott included the following notice:
“This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.”
PW never received any notification from BI that its e-mails to Dr. Scott were monitored by BI.
BI argues that Dr. Scott’s e-mails are not protected by the attorney-client privilege at all as they were not made in confidence since Dr. Scott used his BI e-mail to communicate with his attorney.
The attorney-client privilege is codified in CPLR 4503. The test for privilege is whether the client communicates with an attorney, in confidence, for the purpose of obtaining legal advice. (Rossi v Blue Cross & Blue Shield of Greater N.Y., 73 NY2d 588, 593 [1989].)
Dr. Scott claims that the e-mails were made in confidence, relying on CPLR 4548 which states: “No communication privileged under this article shall lose its privileged character for the sole reason that it is communicated by electronic means *938 or because persons necessary for the delivery or facilitation of such electronic communication may have access to the content of the communication.” The purpose of CPLR 4548 was to recognize the widespread commercial use of e-mail. (Vincent C. Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 4548, at 848.) “The new CPLR provision, in effect, constitutes a legislative finding that when the parties to a privileged relationship communicate by e-mail, they have a reasonable expectation of privacy.” (Id. at 849.) However, some supporters of the bill warned that there are some types of information that are just too sensitive to be transferred over e-mail, such as confession of a crime or trade secret, and thus could not expect to retain the privilege. (NY St Bar Assn supporting statement Jan. 24, 1997.) Accordingly, this statute does not absolve an attorney of his or her responsibility to assess the risk of communicating by e-mail with a client. (NY State Bar Assn Comm on Prof Ethics Op 782 [Dec. 8, 2004].) As with any other confidential communication, the holder of the privilege and his or her attorney must protect the privileged communication; otherwise, it will be waived. For example, when a spouse sends her spouse a confidential e-mail from her workplace with a business associate looking over her shoulder as she types, the privilege does not attach. (Alexander, supra.)
Here, the court is not prepared to determine that attorney-client discussions about suing the client’s employer would rise to the same level as confessing by e-mail to a crime. However, the effect of an employer e-mail policy, such as that of BI, is to have the employer looking over your shoulder each time you send an e-mail. In other words, the otherwise privileged communication between Dr. Scott and PW would not have been made in confidence because of the BI policy.
Dr. Scott relies on People v Jiang for the proposition that under CPLR 4548 BI’s e-mail policy is irrelevant. (33 Cal Rptr 3d 184 [Ct App 2005].) Like New York’s CPLR 4548, California Evidence Code § 917 (b) provides that privileged communications do not lose their privileged character because they are communicated electronically.
In Jiang, defendant was committed to state prison for 19 years after his conviction for rape, among other crimes. (Jiang at 188.) At his attorney’s request, he prepared documents which he saved on the hard drive of his laptop provided to him by his employer. {Id.) The prosecutor used these documents against him. (Id.) Jiang’s employer had an e-mail policy, which Jiang *939 signed, but it did not prohibit personal use. (Id. at 198.) The California Court of Appeals, Sixth District, determined that Jiang had a reasonable expectation of privacy in the documents so as to make them privileged by the attorney-client privilege. (Id. at 205.) Significant to the court was the fact that the documents were never transmitted over his employer’s e-mail server. (Id. at 204.) Furthermore, Jiang “made substantial efforts to protect the documents from disclosure by password-protecting them and segregating them in a clearly marked and designated folder” called “attorney.” (Id.) The employer’s e-mail policy was irrelevant because it was designed to protect the employer’s intellectual property not to bar personal use. (Id. at 205.) Although the court held that California Evidence Code § 197 (b) was inapplicable because there was no “electronic transmission” of documents, it was persuasive to the court which determined that today’s technology should not destroy confidentiality. (Id. at 205; see also Curto v Medical World Communications Inc., 2006 WL 1318387, 2006 US Dist LEXIS 29387 [ED NY 2006] [upholding privilege because e-mails were sent to attorney from employee’s home office on employer issued laptop that was not connected to the employer’s e-mail system and employee deleted the e-mails before returning the laptop to her employer but employer’s forensic consultant was able to restore them].)
The court rejects Dr. Scott’s argument that CPLR 4548 invalidates BI’s policy and holds that BI’s e-mail policy is critical to the outcome here. First, Jiang is not at all persuasive. The e-mail policy in Jiang is significantly different than the policy here which prohibits personal use. A “no personal use” policy combined with a policy allowing for employer monitoring and the employee’s knowledge of these two policies diminishes any expectation of confidentiality, while the policy in Jiang would not have such an effect. (See John Gergacz, Employees’ Use of Employer Computers to Communicate with Their Own Attorneys and the Attorney-Client Privilege, 10 Comp L Rev & Tech J 269, 282 [2006].)
Second, CPLR 4548 does not preclude an employer from adopting a no personal use policy. Indeed, the language of the statute (“[n]o communication . . . shall lose its privileged character for the sole reason”) contemplates that there may be other reasons that an electronic communication may lose its privileged character. Therefore, the court must determine whether Dr. Scott’s use of BI’s e-mail system to communicate *940 with his attorney in violation of BI’s policy renders the communication not made in confidence and thus destroys the attorney-client privilege if it ever applied.
As there is no New York case on point to determine whether the communication here was made in confidence or not, we look for guidance to In re Asia Global Crossing, Ltd., which is a federal bankruptcy case virtually identical to this case and a case upon which both parties rely. (In re Asia Global Crossing, Ltd., 322 BR 247 [SD NY 2005]; see also Long v Marubeni Am. Corp., 2006 WL 2998671, 2006 US Dist LEXIS 76594 [SD NY 2006] [held no attorney-client privilege or work product protection for e-mails exchanged over employer’s e-mail system where employer had formal no personal use policy].) In Asia Global, executives used their employer’s e-mail system to communicate with their personal attorney concerning actual or potential litigation with the employer, the owner of the e-mail system. (322 BR at 256.) The issue in the case was identical to the issue here. (Id. at 251.) The court looked at a variety of federal cases which addressed whether an employee had a reasonable expectation of privacy in his or her office e-mail,[5] but where attorney-client privilege was not an issue. (322 BR at 257-258.)[6] The Asia Global *941 court concluded that the attorney-client privilege would be inapplicable if
“(1) • • • the corporation maintain[s] a policy banning personal or other objectionable use, (2) . . . the company monitor[s] the use of the employee’s computer or e-mail, (3) . . . third parties have a right of access to the computer or e-mails, and (4) . . . the corporation notifies] the employee, or was the employee aware, of the use and monitoring policies?” (322 BR at 257.)
BI’s policy clearly satisfies the first requirement. The court rejects Dr. Scott’s argument that his contract supersedes BI’s policy. Paragraph 12 of the contract provides that it will supersede conflicting BI policies. Dr. Scott argues that implicit in BI’s contractual obligation to provide computer equipment is Dr. Scott’s right to use that equipment for personal reasons.[7] However, there is no conflict where BI agrees to provide Dr. Scott with computer equipment and simultaneously regulates its use. BI has the right to regulate its workplace including the usage of its computers and resources. (See Cardace v Hume, Sup Ct, Nassau County 2003, index No. 000077/02 [allowing for employers to monitor employee e-mails to protect employees from harassment, to prevent legal liability for hostile workplace environment or for security of trade secrets].) The second requirement is satisfied because BI’s policy allows for monitoring. Although BI acknowledges that it did not monitor Dr. Scott’s e-mail, it retains the right to do so in the e-mail policy.
Dr. Scott challenges the policy of a hospital retaining the right to review its employees’ e-mails based on HIPAA, the *942 federal statute that protects patient health information. First, the court rejects this argument because the e-mail at issue is between Dr. Scott and his attorney and has nothing to do with patients. Second, a hospital can certainly have access to its patients’ information. Dr. Scott’s suggestion otherwise is preposterous.
The third Asia Global factor as to whether third parties have access to the computer or e-mails is not relevant here. The New York legislature in enacting CPLR 4548 has decided that access, or potential access, by third parties, such as “persons necessary for the delivery or facilitation of such electronic communication may have access to the content of the communication,” does not destroy the privilege. Further, it does not appear that others could have access to Dr. Scott’s computer. Prior to his departure, Dr. Scott’s computers were located in his locked office and home. According to BI’s chief technology officer, BI’s policy was to delete á departing employees’ information from the computer hardware itself, but not from the BI e-mail server. (Kenneth Lobenstein affidavit, Sept. 23, 2005, If 3.) Accordingly, the only personnel with continuing access to the e-mails at issue after Dr. Scott’s departure would be the computer staff which is addressed by CPLR 4548.
The final factor is whether Dr. Scott had notice of the policy. Dr. Scott had both actual and constructive knowledge of the policy. BI disseminated its policy regarding the ownership of e-mail on its server to each employee in 2002, including Dr. Scott, and provided Internet notice. (See Garrity v John Hancock Mut. Life Ins. Co., 2002 WL 974676, *1, 2002 US Dist LEXIS 8343, *2 [D Mass 2002] [company e-mail policy precluded reasonable expectation of privacy despite employee’s claim that policy was hard to find on company intranet].)
Dr. Scott’s effort to maintain that he was unaware of the BI e-mail policy barring personal use is rejected. As an administrator, Dr. Scott had constructive knowledge of the policy. (Moya v City of New York, 9 Misc 3d 332 [Sup Ct, Kings County 2005] [superintendent’s knowledge of the residency of child imputed to the City]; Polidori v Societe Generate Group, NYLJ, Dec. 12, 2006, at 22, col 1 [Sup Ct, NY County 2006] [knowledge of sexual harassment will be imputed to employer if supervisor of a sufficiently high level is aware of the harassment], affd 39 AD3d 404 [1st Dept 2007].) He required newly hired doctors under his supervision to acknowledge in writing that they were aware of the policy. Under these circumstances, Dr. Scott is charged with knowledge of the BI e-mail policy.
*943 Alternatively, Dr. Scott argues the e-mails are privileged work product. The work product doctrine provides a qualified privilege against disclosure for materials prepared by an attorney in anticipation of litigation. (CPLR 3101 [c].) The issue is whether the work product privilege was waived. Under New York State law, work product is waived when it is disclosed in a manner that materially increases the likelihood that an adversary will obtain the information. (See Bluebird Partners v First Fid. Bank, N.J., 248 AD2d 219, 225 [1st Dept 1998].) While an inadvertent production of a privileged work product document generally does not waive the applicable privilege, there is an exception to that rule if the producing party’s conduct “was so careless as to suggest that it was not concerned with the protection of the asserted privilege” (Securities & Exch. Commn. v Cassano, 189 FRD 83, 85 [SD NY 1999] [internal quotation marks omitted]). Critical to this determination is the reasonableness of the precautions taken to prevent inadvertent disclosure. (Id. at 85 n 4.)
Dr. Scott argues that PW’s notice included in every e-mail PW sent, which warned that the e-mails may be confidential and that it should be notified if anyone other than the intended recipient gains access to the e-mail, is enough to take it out of the exception regarding inadvertent disclosure. However, even the New York State Bar Association has stated, “a lawyer who uses technology to communicate with clients must use reasonable care with respect to such communication, and therefore must assess the risks attendant to the use of that technology and determine if the mode of transmission is appropriate under the circumstances.” (NY St Bar Assn Comm on Prof Ethics Op No. 782 [Dec. 8, 2004].) PW’s notice cannot create a right to confidentiality out of whole cloth. The notice might be sufficient to protect a privilege if one existed. PW’s notice cannot alter the BI e-mail policy. When client confidences are at risk, PW’s pro forma notice at the end of the e-mail is insufficient and not a reasonable precaution to protect its clients.
BI’s Motion for a Protective Order
BI seeks a protective order striking Dr. Scott’s discovery demand for documents concerning BI’s alleged Medicare fraud. Specifically, BI seeks to strike request No. 3 of Dr. Scott’s first request for the production of documents, including its six subparts and request No. 2 of Dr. Scott’s second set of document requests, including its seven subparts.
BI was under investigation by the United States government regarding BI’s compliance with Medicare and Medicaid cost- *944 reporting regulations between 1991 and 2001. The federal action appears to have been initiated in 2001 and BI was served with subpoenas in 2002. On November 30, 2005, Judge Kaplan in the Southern District of New York ordered BI to pay a government fine of $72,997,481.
In request No. 3, plaintiff seeks:
“Documents sufficient to show BI’s economic prospects and financial status from January 2001 through the present, including but not limited to “(a) all documents relating to any penalties, fines or reimbursements (jointly referred to as ‘recoveries’) incurred, paid by or sought from [BI], or any of its agents or representatives, including but not limited to recoveries incurred, paid by or sought as a result of alleged fraudulent or otherwise illegal or improper behavior;
“(b) all documents relating to the financial performance and economic prospects of the Singer Division;
“(c) all documents comprising or relating to any fully or partially completed, in-progress, or contemplated financial analysis of [BI], the Singer Division or the Department of Orthopedics;
“(d) all documents comprising or relating to internal or external communications by, from or to [BI] regarding Dr. Scott’s suggestions for establishing special surgery hospital facility at the Singer Division;
“(e) all documents comprising or relating to BI’s claims that $10.1 million of the Singer Division 2002 losses were attributable to the Department of Orthopedics in 2002, including but not limited to all documents upon which BI based those claims;
“(f) all documents comprising or relating to internal or external communications by, from or to BI regarding Dr. Scott’s request for an independent financial analysis of the Department of Orthopedics and its responsibility or lack thereof for any losses incurred at the Singer Division.”
At a July 14, 2005 discovery conference, BI was directed to produce financial documents from 2002 to 2004, documents concerning fines paid to government entities from 2002 to 2004, and board minutes from 2002 to 2004. With regard to request No. 3 (a), Dr. Scott was directed to narrow the document request concerning malpractice settlements.
*945 The revision was made in request No. 2 (a) of Dr. Scott’s second document request, dated July 29, 2005, and states:
“2. Documents showing BI’s economic prospects and financial status from January 1, 2001 through the present:
“(a) the following documents relating to penalties, fines or reimbursements (jointly referred to as ‘recoveries’) incurred, paid by or sought from BI or any of its agents or representatives, including but not limited to recoveries incurred, paid by or sought as a result of alleged fraudulent or otherwise illegal or improper behavior:
“(i) all communications to, from or among any Directors relating to alleged fraudulent or otherwise illegal or improper behavior;
“(ii) all documents relating to any alleged fraudulent or otherwise illegal or improper behavior which was the subject of communications to from or among Directors;
“(in) all communications to or from any governmental or regulatory agency relating to alleged fraudulent or otherwise illegal or improper behavior;
“(iv) all documents relating to any inquiry investigation or demand made by any governmental or regulatory agency as a result of such alleged fraudulent or otherwise illegal or improper behavior;
“(v) all commendations to, from or among any Directors relating to any alleged claims of malpractice which claimed damages exceeding $3 million;
“(vi) from 2001 onwards, documents sufficient to show the annual total payments arising out of claims of alleged malpractice;
“(vii) all documents relating to [or] concerning coverage in print, television or the internet of any alleged fraudulent or otherwise illegal, improper or negligent behavior by any employee of [BI].”
BI argues that (1) responding to the request would be burdensome, as it would yield 100,000 pages, which have already been produced to the government, (2) the request is irrelevant to this employment dispute, and (3) responding to the request may upset negotiations to settle the government investigation. Dr. Scott maintains that the requested documents are relevant to BI’s counterclaims against Dr. Scott and key to Dr. Scott’s case that BI terminated him not for cause, but to generate cash to *946 pay for government fines arising from years of defrauding the government.
BI asserted eight counterclaims against Dr. Scott including (1) breach of contract; (2), (3) breach of fiduciary duty; (4) recovery of money paid to Dr. Scott; (5) tortious interference with contract; (6) unfair competition; (7) violation of Lanham Act; and (8) false and deceptive advertising.
Dr. Scott justified his request for documents relating to Medicare fraud relying upon paragraphs 78 and 79 of BI’s counterclaims which refer to the $10 million loss that BI sustained in 2002 at the Singer Division and which BI alleged: “Continued losses of that magnitude by the Singer Division threatened the continued financial viability of [BI] as a whole.” Dr. Scott also relied upon BI’s paragraph 108 of the counterclaims which states:
“When [BI] discovered that the Singer facility was losing money at a rate that meant disaster for [BI] if it were not reversed, and that the Department of Orthopedics was largely responsible for the losses, Dr. Scott, in breach of his fiduciary duties to BI:
“(i) failed and refused to accept that financial reality and set out to try to disprove it;
“(ii) failed and refused to acknowledge that he had a long-term contract with Beth Israel, and refused also to recognize that he owed fiduciary obligation to the Hospital;
“(iii) failed and refused to participate in [BI]’s cost-savings plan, despite his duty as Chairman to do that;
“(iv) failed and refused even to discuss with Zimmer the possibility of getting the large discounts that Zimmer was giving to other comparable institutions;
“(v) began trying to relocate to another institution, despite his long-term contract with [BI];
“(vi) began to induce other doctors to leave [BI] with him, in violation of those doctors’ contracts with [BI] and in violation of his fiduciary duties to [BI];
“(vii) began making a record that he hoped would support an argument that [BI] breached first, by failing to support his Department;
“(viii) went so far in violation of his duties to [BI] as to demonstrate in public outside of the Singer fa *947 cility;
“(ix) failed sincerely to consider the alternative space option offered by [BI];
“(x) in the end, relocated to Lenox Hill Hospital, pirated a significant number of doctors in [BI]’s Department of Orthopedics to go with him to Lenox Hill Hospital, and also misappropriated the ISK name and began to use it in competition with [BI].”
BI offered to amend its answer by striking these paragraphs if Dr. Scott would withdraw his offensive discovery requests. Dr. Scott rejected the offer maintaining that the requests are relevant to the case with or without the amendments.
The court finds that documents concerning events that transpired from 1991 to 2002 are not relevant to this 2004 employment contract dispute.
The court rejects BI’s argument that allowing Dr. Scott to have access to the fraud audit documents would jeopardize settlement of the government investigation. The investigation ended with the judgment made pursuant to a stipulation and order of settlement and dismissal. Accordingly, BI’s fear of affecting the confidential negotiations is moot.
However, BI need not produce “fraud audit” documents which it produced to the government. An understanding of the nature of the government’s claims against BI is not relevant to this employment action. Contrary to Dr. Scott’s argument, documents from 1991 to 2002 when BI was served with the government subpoena will not explain why BI decided to terminate Dr. Scott. Likewise, Dr. Scott’s request for all court records currently under seal in the now settled federal fraud action is also irrelevant to this action. In addition, a document request for sealed documents in a federal action on page 4 of a brief filed in a state court action is procedurally incorrect. Further, documents or reports created by BI to defend itself against the government investigation would not address BI’s decision to terminate Dr. Scott or the financial condition of the Singer Division. Nor will the requested documents from 1991 to 2002 assist Dr. Scott in answering BI’s interrogatories concerning Dr. Scott’s understanding of the financial condition of the Singer Division from 2002 to 2004.
However, the financial condition of both BI and the Singer Division leading up to Dr. Scott’s termination is relevant to this action. BI contends that Dr. Scott’s mismanagement led to the Singer Division’s demise. Dr. Scott maintains that it was BI’s *948 deteriorating condition, prompted by BI’s own fraud, that led to his termination. He is entitled to financial documents which will allow him to prove it.
The relevant time period for assessing BI’s financial condition begins in 2002 when BI received the government’s subpoena, not 1991 when Dr. Scott’s discovery demand begins. Dr. Scott joined BI in 1991. He became chair of the orthopedics department in 1998. The contracts at issue here were entered into in 1998 and 1999. BI allegedly learned in February 2004 that Dr. Scott was negotiating with competing hospitals. Dr. Scott asserted that his contractual obligation to BI terminated on October 15, 2004. Meanwhile, BI’s financial condition was allegedly deteriorating. In May 2004, BI informed Dr. Scott, and other Singer personnel, that the Singer facility would close in August 2004. Dr. Scott and BI entered into an agreement preserving their rights and claims against each other and providing that Dr. Scott would continue to work for BI until December 31, 2004 or until the Singer facility closed. On June 10, 2004, Dr. Scott participated in a public demonstration protesting the closure of the Singer facility. He was terminated on July 15, 2004. Dr. Scott continued to work for BI until August 3, 2004 when the Singer facility closed. When the government subpoena was served in 2002, BI might begin to consider the potential financial impact of the government investigation and make plans for funding the potential liability. Indeed, the financial documents produced to Dr. Scott estimated BI’s exposure in June 2004 at $77.4 million. Although BI is to make payments to the government until the end of 2007, pursuant to the November 30, 2005 stipulation and order of settlement and dismissal, the time frame for the production of documents here shall continue to the end of 2004 when BI closed the Singer Division.
BI has produced for the period January 1, 2001 to the present annual financial statements audited by Ernst & Young, monthly operations and finance reports to continuum board, minutes of meetings of board of trustees, monthly reports to the finance committee, monthly reports to the BI Medical Center Board of Trustees, finance committee reports, budgets and preliminary operating results, finance committee meeting minutes, profit and loss statements, operating statements for the Singer Division, financial analysis for the Singer Division, departmental financial analysis for the Singer Division and revenue distribution reports. It appears that BI’s production is sufficient.
*949 Therefore, request Nos. 3 (a) of Dr. Scott’s first document demand and 2 (a) (i)-(iv) of Dr. Scott’s second document request are struck to the extent that they seek documents prior to 2002 when BI was served with the government subpoena and BI’s motion for a protective order is granted.
Accordingly it is ordered that Dr. Scott’s motion for a protective order is denied; and it is further ordered that BI’s motion for a protective order is granted.

. This motion was originally designated motion sequence 5.

. From the papers it is unclear whether Paul Weiss Rifkind Wharton & Garrison LLP or Dr. Scott moves for relief. Since the client controls the privilege (CPLR 4503 [a]), the court treats the motion as made by Dr. Scott.

. This motion was originally designated motion sequence 8.

. The motion was denied as moot when the case was dismissed by decision and order dated May 12, 2006. The action and motion were restored pursuant to the Appellate Division decision of June 19, 2007.

. An employee’s expectation of privacy is not the equivalent of whether the communication was made in confidence. (John Gergacz, Employees’ Use of Employer Computers to Communicate with Their Own Attorneys and the Attorney-Client Privilege, 10 Comp L Rev & Tech J 269, 274-275 [2006].) However, the privacy cases can provide sound guidance.

. Another reason to look to the Asia Global case is that unreported New York cases addressing an employee’s expectation of privacy, albeit in situations different from this case, apply the same considerations and yield the same conclusions as those federal cases reviewed by the court in Asia Global. (Lacker v Marubeni Am. Corp., Sup Ct, NY County 2005, index No. 120807/03 [in an attorney’s action to recover legal fees, an application to seal certain e-mails recovered from computers belonging to defendants which were used by the law firm’s personnel allegedly during billable time for highly personal communication was denied because law firm personnel had no expectation of privacy in using defendant’s computers]; Silverberg & Hunter, LLP v Futterman, Sup Ct, Nassau County 2002, index No. 992976/02 [after plaintiff employers terminated defendant employee, plaintiffs accessed defendant’s password protected hard drive and e-mail account and determined that defendant was serving defendant’s own clients while billing plaintiffs clients; motion to suppress e-mails denied]; Carduce v Hume, Sup Ct, Nassau County 2003, index No 000077/02 [in employees’ breach of contract action against their employer, employees sought to suppress e-mails between them showing an ongoing relationship between them during business hours as well as inappropriate pornographic pictures and e-mails designed to divert customers from the employer. Motion denied as employees had no reasonable expectation of *941 privacy in their work e-mail as well as defendant’s legitimate interest in protecting employees from harassment].)

. With regard to “Staffing, Space, Equipment,” paragraph 4 of the contract provides:
“The Medical Center shall provide you with suitable staff, office space, equipment, supplies, utilities, janitorial service and such other services necessary for the proper functioning of the Department, including the following: . . .
“(c) Your private practice area will be equipped with desks, chairs, carpeting, file cabinets, examination tables and cabinets, window treatments and medical, surgical, central sterile and pharmacy supplies as needed. You will also be provided with heat, light, power, telephone usage, custodial and maintenance services and basic computer cabling.”
Under the contract, Dr. Scott’s reimbursable expenses include: “computer hardware, computer software and computer consulting service expenses.” (Schedule 6b.)